**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| **AIDEN YEAW, ALEX C. BROWN,** and all others similarly situated, | |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| vs. | **CIVIL ACTION NO. 14-10035** |
| **FMR LLC; FMR LLC RETIREMENT COMMITTEE; and John and Jane Does 1-25,** | |
| Defendants. | |

**Table of Contents**

I.     NATURE OF THE ACTION ................................................................................1

II.    JURISDICTION AND VENUE ........................................................................4

III.   PARTIES ...........................................................................................................4

      A.     Plaintiff ................................................................................................4

      B.     Defendants ..........................................................................................4

IV.   FACTS ...............................................................................................................6

      A.     The Plan. ..............................................................................................6

      B.     Defendants' Revenue-Sharing Practices ...........................................7

      C.     Defendants Disclose Virtually Nothing About Their Arrangements ........................11

      D.     FMR and Its Subsidiaries and Affiliates are Under Common Control ........................14

V.     ERISA'S FIDUCIARY STANDARDS AND PROHIBITED TRANSACTIONS ............15

VI.   CLASS ALLEGATIONS ................................................................................20

VII.  CLAIMS FOR RELIEF ..................................................................................22

VIII. DEMAND FOR JURY TRIAL ......................................................................24

IX.   PRAYER FOR RELIEF ..................................................................................24

Plaintiffs Aiden Yeaw and Alex C. Brown, participants in the FMR LLC Profit Sharing Plan ("Plan"), bring this action individually and as representatives of a class of similarly situated persons, on behalf of the Plan against FMR LLC ("FMR")[1]; FMR LLC Retirement Committee ("Retirement Committee"); and John and Jane Does 1-25 (collectively, "Defendants or Fidelity" except as the context otherwise requires).

# I. <u>NATURE OF THE ACTION</u>

1.      This is a civil enforcement action under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1001 *et seq.*, and in particular under ERISA §§404, 406, 409, 502(a) (2), 29 U.S.C. §§1104, 1106, 1109, 1132(a) (2). Plaintiffs bring this action on behalf of the Plan to recover losses to the Plan and to compel disgorgement of unlawful fees and profits taken by Fidelity.

2.      This class action is brought on behalf of participants in the Plan from January 8, 2008 through the present ("Relevant Period" or "Class Period").

3.      Fidelity and other mutual fund advisors enter into revenue-sharing arrangements with their client plans. Under these arrangements, the fund advisor, here Fidelity Management & Research Company (and/or some of its affiliates) ("Fidelity Management"), pays to the plan's recordkeeper, here Fidelity Investments Institutional Operations Company, Inc. ("Fidelity Operations"), a share of the revenue received by the advisor from the mutual fund(s) held by the plan (hence the term revenue-sharing) to defray some or all of the recordkeeping and administrative costs of operating the plan. A prudent and loyal fiduciary seeks to recapture revenue-sharing for its

---

[1] FMR LLC is more commonly known as Fidelity Investments. References to "Fidelity" are to FMR LLC including all its subsidiaries and affiliates. References to FMR are to FMR LLC as to that entity alone. Other references for subsidiaries and affiliates of FMR are defined throughout.

plan when such payments exceed the reasonable value of recordkeeping services. This is especially true of very large plans such as the Plan here.

4.      Had the Plan entered into an arms' length relationship with Fidelity pursuant to an agreement negotiated by a prudent and unconflicted fiduciary, the Plan would have paid a per-participant fee annually substantially lower than the $20-$27 market fee for such services because Fidelity would have only been able to charge for its direct expenses. Assuming a per-participant direct expense of $10, Fidelity effectively charged its Plan thirty-five times what it should have charged its Plan.

5.      The terms of a revenue-sharing arrangement are driven by several variables. Plans that select actively-managed equity funds generate more revenue-sharing payments. Plans that adopt a closed-architecture investment structure, meaning that the plan's investments are limited to mutual funds offered by the recordkeeper or platform provider (or its affiliates), tend to generate greater revenue-sharing payments. And a plan with substantial assets to invest has increased bargaining power.

6.      Very large plans often receive rebates to the extent that revenue-sharing payments exceed a fixed amount. One term for this arrangement is "revenue-sharing recapture." The fixed amount under such arrangements is often based on the number of participants in the plan multiplied by an annual per-participant fee.

7.      Assume, for example, that $20 is a reasonable per-participant fee for a billion dollar plan and that such a plan has 55,000 participants. The annual record-keeping fee for such a plan would be approximately $1.1 million. In an arm's length transaction, one would expect a prudent and unconflicted fiduciary to enter into an arrangement with the record-keeper whereby the record-keeper would rebate to the plan revenue-sharing payments in connection with the plan's investments that exceeded $1.1 million.

8.     The Fidelity Plan is among the largest defined contribution plans in the United States, with approximately $9.5 billion in investment assets at the end of 2012. In 2012, the Fidelity Plan had approximately 71% of its investment assets in actively-managed Fidelity mutual funds. The Fidelity Plan maintains a closed-investment architecture, meaning that all of the investment options are managed by an affiliate of the recordkeeper. Under these circumstances, one would expect the Fidelity Plan's fiduciaries to have negotiated a very favorable revenue-sharing recapture arrangement.

9.     But the Fidelity Plan did not receive a single dollar in revenue-sharing recapture. Instead, the Fidelity Defendants who ran the Fidelity Plan arranged with Fidelity Operations and Fidelity Management to keep all revenue-sharing for Fidelity. This arrangement cost the Fidelity Plan and its participants approximately $15 million a year for the years 2008-2013, or approximately $90 million during the Relevant Period.

10.     If a plan the size of the Fidelity Plan is operated free of conflicts of interest and its fiduciaries choose a closed architecture investment platform and a heavy concentration of active equity funds, such as the Fidelity Plan did here, prudent, loyal, unconflicted, and thrifty fiduciaries obtain for their plan millions of dollars annually in revenue-sharing recapture. But the Fidelity Plan was operated by Fidelity, its subsidiaries, and their officers and managers. They ensured that the Fidelity Plan got nothing. Fidelity essentially took $15 million a year from its own retirement plan.

11.     To add insult to injury, Fidelity and its managers reported that Fidelity was providing recordkeeping and administrative services for "free."

12.     Defendants, during the time period at issue in this action, were fiduciaries of the Plan and were required by ERISA, to act solely in the interest of the Plan's participants. Defendants were responsible for choosing service-providers for the Plan and setting the terms and arrangements for such services.  Rather than fulfilling their fiduciary duties, among the "highest [duties] known to the

3

law," *Donovan v. Bierwirth*, 680 F.2d 263, 272 (2d Cir. 1982), Defendants caused the Plan to forego tens of millions of dollars in revenue-sharing rebates that Fidelity kept for itself.

13.     Thus Defendants violated their duties to act solely in the interests of the Plan and its participants; defray the expenses of Plan administration; and to be prudent with Plan assets. Defendants also engaged in prohibited transactions with Plan assets.

## II. JURISDICTION AND VENUE

14.     This Court has exclusive jurisdiction over the subject matter of this action under 29 U.S.C. §1132(e) (1) and 28 U.S.C. §1331 because it is an action under 29 U.S.C. §1132(a) (2) and (3).

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 and ERISA §502(e) (1), 29 U.S.C. §1132(e) (1).

16.     Venue is proper in this district pursuant to ERISA §502(e) (2), 29 U.S.C. §1132(e) (2), because Defendants' principal place of business is located in this district.

## III. PARTIES

**A.     Plaintiffs**

17.     **Aiden Yeaw ("Yeaw").** Plaintiff Yeaw participated in the Plan during the Relevant Period.

18.     **Alex C. Brown ("Brown").** Plaintiff Brown participated in the Plan during the Relevant Period.

**B.     Defendants**

19.     **FMR LLC ("FMR").** FMR is a financial services conglomerate, also known as Fidelity Investments. Its executive offices are located in Boston, Massachusetts.

20.     FMR is the Plan sponsor and, therefore, by definition a party in interest to the Plan under 29 U.S.C. §1002(14).

21.     FMR is the plan administrator,[2] and thus a fiduciary under ERISA.

22.     FMR and its subsidiaries, identified below, also provide trustee, recordkeeping , and administrative services to the Plan.

23.     Fidelity Investments Institutional Operations Company, Inc. ("Fidelity Operations") is a wholly-owned subsidiary of FMR.[3] Fidelity Operations provides administrative, participant recordkeeping, accounting functions and other plan related services to the Plan. *Id.*

24.     Fidelity Management Trust Company ("Fidelity Trust") is a wholly-owned subsidiary of FMR and provides trust services to the Plan.[4]

25.     Fidelity Management & Research Company ("Fidelity Management") is the investment advisor to the Fidelity Funds in the Plan and is a wholly-owned subsidiary of FMR.[5]

26.     FMR also created a committee, the FMR LCC Employee Retirement Committee ("Retirement Committee"), to administer the Plan.[6] FMR, through its Board of Directors, assigned the Retirement Committee its responsibilities. FMR, through its Board of Directors,[7] and/or its senior officer for Human Resources,[8] appointed the members of the Retirement Committee.

27.     FMR has the authority to initiate or defend any lawsuit or litigation related to the Plan in its own name without reference to the Retirement Committee.[9]

28.     FMR, acting by and through its Board of Directors, senior officer for Human Resources, and the Retirement Committee, exercised discretionary authority and control over Plan

---

[2] 2008 Summary Plan Description, Administration, at 217 (Exhibit 1); 2012 Form 5500, Auditor's Report at 6, 11, (Exhibit 2).
[3] 2012 Form 5500, Auditor's Report at 11 (Exhibit 2).
[4] 2012 Form 5500, Auditor's Report at 11 (Exhibit 2).
[5] 2012 Form 5500, Auditor's Report at 11 (Exhibit 2).
[6] 2005 Plan Document at 11, Art. 2.70 (Exhibit 3).
[7] 2012 Form 5500, Auditor's Report at 11 (Exhibit 2).
[8] 2005 Plan Document at 59, Art. 11.1(a) (Exhibit 3).
[9] 2005 Plan Document at 60, Art. 11.1(g) (Exhibit 3).

administration and control over the management and disposition of the Plan's assets. As such, FMR is a fiduciary within the meaning of 29 U.S.C. §1002(21)(A).

29.     FMR, at all applicable times, has exercised control over the activities of its employees, internal departments and subsidiaries that performed fiduciary functions with respect to the Plan, and, on information and belief, can hire or appoint, terminate, and replace such employees at will. FMR is, thus, liable for the fiduciary breaches alleged herein of its employees, internal departments and subsidiaries.

30.     FMR, as a corporate entity, cannot act on its own without any human counterpart. In this regard, FMR relied directly on the other Defendants named herein to carry out its fiduciary responsibilities under the Plan and ERISA. The acts of FMR's officers and employees alleged herein are the acts of FMR.

31.     **Doe Defendants.** Doe Defendants include additional Plan fiduciaries whose names and identities are not presently known to Plaintiffs, including the identities of the members of the Retirement Committee during the proposed class period. Plaintiffs will substitute the real names of the John and Jane Does when they are known to Plaintiffs.

## IV. <u>FACTS</u>

**A.     The Plan.**

32.     The Plan is an "employee pension benefit plan" within the meaning of ERISA §3(2)(A), 29 U.S.C. §1002(2)(A)

33.     The Plan is a "defined contribution plan" within the meaning of ERISA §3(34), 29 U.S.C. §1002(34).

34.     The Plan covers eligible employees of FMR and its subsidiaries and affiliates.

35.     The Plan had 54,114 participants with account balances as of December 31, 2012.

36.     The Plan had total investment assets valued at approximately $9.5 billion as of December 31, 2012.[10]

37.     FMR and the members of the Retirement Committee were (and are) responsible for contracting and making arrangements for reasonable services to the Plan.

38.     FMR and the members of the Retirement Committee were (and are) responsible for deciding which investments to include in the Plan.

39.     The Plan requires that the "principal and income of the Plan shall never be paid or revert to any [Fidelity Affiliate], or be used for any purpose whatsoever other than the exclusive purpose of providing benefits to the Participants or their Beneficiaries and defraying the reasonable expenses of administering the Plan."[11]

## B.     Defendants' Revenue-Sharing Practices

40.     Fidelity has one of the largest retirement plan businesses in the world. It serves as recordkeeper for thousands of defined contribution plans, including its own profit sharing plan, i.e., the Plan at issue here, and as an investment advisor to mutual funds and nonregistered funds in which retirement plans invest.

41.     Recordkeepers like Fidelity Operations generally allow retirement plans for which they provide recordkeeping services to invest in funds established and managed by the recordkeeper as well as funds established and managed by other, unaffiliated companies.

42.     Recordkeepers like Fidelity generally offer their client plans the choice between a "closed architecture" arrangement, which means the plan only invests in funds established and managed by the recordkeeper or one of its affiliates, and an "open architecture" arrangement, which

---

[10] 2012 Form 5500, Auditor's Report at 18 (Total Investments) (Exhibit 2).
[11] 2005 Plan Document at 2, Art. 1.2 (Exhibit 3).

allows the plan to invest in funds established and managed by companies unaffiliated with the recordkeeper.

43.    Plans that adopt a closed architecture arrangement generally receive very favorable terms with respect to investment management, recordkeeping, and administrative fees.

44.    It is common under both closed and open architecture arrangements for an advisor to a mutual fund in which a plan invests to pay to the recordkeeper a share of its investment advisory fee, hence the term "revenue-sharing", to defray plan administration fees and expenses that would otherwise be charged directly to the plan.

45.    A revenue-sharing payment is typically based on a percentage of the plan's assets in the given fund, usually expressed in basis points. One basis point = .0001.

46.    The amount of revenue-sharing paid by an advisor to a mutual fund to a recordkeeper depends on several factors. Advisors to actively-managed funds generally pay more revenue-sharing than index funds. Many index fund advisors pay no revenue-sharing at all. Equity fund advisors generally pay more revenue-sharing than bond fund advisors. And closed-architecture arrangements often result in the highest level of revenue-sharing because the service provider is capturing all of the plan's business and receiving all of its fees.

47.    In Fidelity's case, its index funds, called Spartan Funds, pay no revenue-sharing. Its actively-managed equity funds pay 25 basis points and its bond funds pay 10 basis points.[12]

48.    When a plan uses Fidelity as its recordkeeper and invests in Fidelity's Magellan Fund, a percentage of the amount invested by the plan is "transferred internally from Fidelity Research,

---

[12] Eligible Indirect Compensation (Exhibit 4). Downloaded Nov. 11, 2013 from: https://www2.troweprice.com/rms/rps/Sponsors/DefaultContent/StaticAssets/2012%20Non-TRP%20Investment%20Disclosures/Fidelity_5500_Funds.pdf. Plaintiffs have also assumed for purposes of this analysis that the money market fund in which the Plan invested $876 million did not make any revenue-sharing payments.

which manages the Magellan Fund, to Fidelity Trust. This has been described by Fidelity and others as "'internal revenue-sharing'." *Tussey v. ABB, Inc.*, No. 06-04305, 2012 WL 1113291, *2 (W.D. Mo. Mar. 31, 2012). It is called internal revenue-sharing because the revenue is shared between an affiliated fund advisor and an affiliated recordkeeper, i.e., the revenue is shared within the same corporate family.

49.     Because the amount of revenue shared is based on a percentage of a plan's investment in given mutual funds, the revenue-sharing payments received by the record-keeper (or other service provider) increase as plan assets in the given funds increase. But the costs of recordkeeping and other administrative services remain relatively constant. A prudent and loyal fiduciary seeks to recapture revenue-sharing for its plan when revenue-sharing payments exceed the reasonable value of recordkeeping services.

50.     When revenue-sharing payments exceed the market rate for the value of recordkeeping services, a fiduciary is obligated to seek rebates to the plan for the excess amount. *Tussey*, at *10.

51.     A plan fiduciary, in fulfilling its fiduciary duties to a plan, must consider how a plan's size can be leveraged to reduce recordkeeping costs. *Tussey*, at *10.

52.     Thus, very large plans, similar in size to the Plan at issue here, often negotiate revenue-sharing recapture agreements. Under such agreements, the recordkeeper and the plan's fiduciaries agree to cap recordkeeping and administrative fees at a fixed amount, usually a per-participant dollar amount. To the extent that revenue-sharing payments to the recordkeeper exceed the capped amount, the difference is rebated to the plan.

53.     The Fidelity Plan has the ability to obtain among the most favorable revenue-sharing recapture arrangements in the market for several reasons. First, the Fidelity Plan is among the largest defined contribution plans in the country, with approximately $9.5 billion in assets as of its 2012

financial statement. A plan this size will typically generate tens of millions of dollars in revenue-sharing payments. Second, the Fidelity Plan is in a closed-architecture arrangement, meaning that all the Plan's investments are Fidelity funds and Fidelity collects all the fees, giving Fidelity great incentive to provide favorable revenue-sharing recapture to the Plan to obtain and keep its business. Third, the Plan is heavily concentrated in actively managed funds, which generate high fees for the fund advisor and correspondingly high levels of revenue-sharing. As of the end of 2012, 71% of the Plan's assets were invested in Fidelity actively managed equity funds.

54.     Based on Fidelity's usual revenue-sharing arrangements and the amount the Plan invested in Fidelity Funds, Plaintiffs estimate that Fidelity Management, under ordinary circumstances with an unaffiliated plan, would have made approximately $90 million in revenue-sharing payments to the Plan's recordkeeper, Fidelity Operations, in the years 2008-2013.

55.     According to the 2012 Form 5500, the Plan had 54,114 participants at the end of that year. Given the Plan's closed architecture and the weighting of Plan's investments in actively-managed funds, especially equities, in a typical arm's length arrangement, Fidelity Management, the advisor to the Fidelity Funds in the Plan, would have paid an estimated $18,165,855 in revenue-sharing payments (if not more) in 2012 to the recordkeeper (whether the recordkeeper was Fidelity Operations or an unaffiliated entity). That equates to a per-participant record-keeping fee of approximately $335 in 2012 ($18,165,855 (revenue-sharing payment) ÷ 54,114 (participants)).

56.     A reasonable, market value for Fidelity's recordkeeping services in 2007 was between $20 and $27 per participant annually. *George v. Kraft Foods Global, Inc.*, 641 F.3d 786, 798 (7th Cir. 2011) (describing expert testimony).

57.     The per-participant market value for recordkeeping services, especially for mega defined contribution plans, has gone down substantially since 2007.

10

58.     Fidelity is not permitted to charge its plan anything but its direct costs in providing recordkeeping services to its plan. 29 C.F.R. §2550.408b-2(e).

59.     Had the Plan entered into an arms' length relationship with Fidelity pursuant to an agreement negotiated by a prudent and unconflicted fiduciary, the Plan would have paid a per-participant fee annually substantially lower than the $20-$27 market fee for such services because Fidelity would have only been able to charge for its direct expenses. Assuming a per-participant direct expense of $10, Fidelity effectively charged its Plan thirty-five times what it should have charged its Plan.

60.     For the entire Class Period, the Plan should have paid, at most, approximately $3.34 million in recordkeeping fees to Fidelity—far less than the approximately $92 million the Plan's investments generated in revenue-sharing payments during the Class Period. Thus, Fidelity effectively caused the Plan to give over $88 million to Fidelity. It could not have done so without controlling the Plan's selection of investments and service-providers.

## C.     Defendants Disclose Virtually Nothing About Their Arrangements

61.     The Summary Plan Description, the primary document for conveying information about the Plan to participants, does not identify any of the FMR affiliates that provide services to the Plan, except FMR as the plan administrator and Fidelity Trust as the trustee.[13]

62.     The Summary Plan Description does not say anything about revenue-sharing or fees paid to Fidelity, directly or indirectly, by the Plan.

63.     The Investment Brochure distributed to Plan participants does not say anything about revenue-sharing or mention that Fidelity Operations provides administrative and

---

[13] 2008 Summary Plan Description, Administration, at 217 (Exhibit 1).

recordkeeping services to the Plan.[14] Nor does the Investment Brochure detail any of the fees paid to Fidelity, directly or indirectly, by the Plan.

64.     The periodic account statements received by participants in the Plan only set out the fee/penalty for redeeming mutual fund shares held less than 30, 60, or 90 days, depending on the fund, but not any other fees or expenses paid by the Plan, directly or indirectly, to Fidelity.

65.     The 2008 Auditor's Report for the Plan, attached to the 2008 Form 5500, states that "[c]ertain expenses related to recordkeeping and administration of the Plan are incurred by the Company. No fees for such services are charged directly to the Plan."[15] Although this statement suggests that the Plan pays for services indirectly, it does not identify any such indirect payments.

66.     The annual Form 5500 for the Plan, to which the Auditor's report is attached, states that Fidelity provides recordkeeping services to the Plan at no charge.[16]

67.     Fidelity as plan administrator and plan sponsor signs the Form 5500 under penalty of perjury.[17]

68.     Among other things, the Form 5500 is required to disclose all compensation, direct or indirect, paid by the Plan to every service-provider to the Plan. The instructions for the Form 5500 Schedule C require the filer, here Fidelity, to identify all the indirect expenses paid to every person or entity by a mutual fund, as well as identifying the nature of the service provided by selecting one or more of 55 service codes listed in the instructions.

69.     The Schedule C instructions also explain that reportable indirect compensation includes investment advisor fees, 12b-1 fees, shareholder service fees, and fees related to the administration of the plan such as recordkeeping services.

---

[14] Choosing Your Investments ("Investment Brochure") (Exhibit 5).
[15] 2008 Form 5500, Auditor's Report at 10 (Exhibit 6).
[16] 2012 Form 5500, Auditor's Report at 11 (Exhibit 2).
[17] 2012 Form 5500 at 1 (Exhibit 2).

70.     Fidelity greatly underreports the indirect compensation it receives from the Plan, and misstates the nature of the services it provides to the Plan. For example, on page 23 of the Form 5500 Schedule C for 2012, Fidelity reports that Fidelity Operations received .55% (or 55 basis points) of the Plan's investment in the Fidelity Contrafund in that year for providing "fund management" services.[18] This is inaccurate for at least two reasons. First, Fidelity Management, not Fidelity Operations, is the manager or investment advisor of the Contrafund. Second, Fidelity (through its subsidiaries) received substantially more in indirect compensation from the Plan's investment in the Contrafund than 55 basis points. The total expense ratio for the Contrafund K class in which the Plan invested, according the 2013 prospectus, is 74 basis points.[19] The Statement of Additional Information (SAI) for the Contrafund reveals that Fidelity Operations receives additional fees (but not the amount of the fees) for transfer agent services.[20] These fees are not disclosed by Fidelity on the Plan's Schedule C. The SAI also reveals service agent and securities lending agreements with another Fidelity entity, Fidelity Service Company (but not the amount of the fees paid to Fidelity Service Company). *Id.* at 45-46. Compensation and payments to Fidelity Service Company are not disclosed by Fidelity on the Plan's Schedule C. Thus, Fidelity did not disclose approximately 20 basis points of indirect compensation that it received in connection with the Plan's investment in the Contrafund. 20 basis points of the $539,868,407 million invested in the Contrafund is $1,079,736 of undisclosed indirect compensation received by Fidelity from its own Plan for only one investment.

71.     The Schedule C for the Plan reflects that Fidelity only reports the investment advisor fee (and often not even that) on the Plan's Schedule C for any given Fidelity Fund, but none of the

---

[18] 2012 Form 5500 at 1 (Exhibit 2)
[19] Fidelity Contrafund March 1, 2013 Prospectus, at 24 (Exhibit 7).
[20] Fidelity Contrafund Statement of Additional Information, March 1, 2013, at 45 (Exhibit 8).

other fees, just as it did with the Contrafund. Extrapolating from the non-reported expenses with respect to the Contrafund, Plaintiffs estimate that Fidelity underreported its indirect compensation from its own Plan by approximately $20 million a year.

72.     This number correlates closely to the estimated revenue-sharing payments a plan the size of the Fidelity Plan would expect to generate under the present arrangement.

**D.     FMR and Its Subsidiaries and Affiliates are Under Common Control**

73.     All of the relevant Fidelity entities are wholly-owned subsidiaries of FMR, and therefore under its common control and the control of FMR's directors. Under such circumstances, courts disregard the corporate form. *See Lowen v. Tower Asset Mgmt., Inc.*, 829 F.2d 1209, 1220-21 (2d Cir. 1987).

74.     The Retirement Committee was created by FMR and derives all of its authority and powers from FMR.

75.     FMR's Board of Directors and Senior Human Resources officer are responsible for appointing and monitoring the members of the Retirement Committee, which administers the Plan.

76.     Although the identities of the members of the Retirement Committee are not known to Plaintiffs because Defendants do not disclose their identities, it is standard practice for the members of such committees to be senior officers and managers of the employer. Thus, it is more likely than not that the members of the Retirement Committee are officers and managers of FMR or one of its subsidiaries.

77.     FMR is a privately-held company. Its principal owners are members of the Johnson family and an unknown number of employees (likely fewer than 500) of FMR or its subsidiaries. Some or all of the members of the Retirement Committee may be shareholders of FMR and thus may personally profit from the Plan's business with Fidelity.

14

78.     Some or all of the members of the Retirement Committee may serve in a management or portfolio advisory capacity such that their personal compensation is impacted by the Plan's business with Fidelity.

## V. ERISA'S FIDUCIARY STANDARDS AND PROHIBITED TRANSACTIONS

79.     ERISA imposes strict fiduciary duties of loyalty and prudence upon the Defendants as fiduciaries of the Plan. ERISA §404(a), 29 U.S.C.§1104(a), states, in relevant part, that:

> [A] Fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and —
>
> (A)     For the exclusive purpose of
>
> > (i)     Providing benefits to participants and their beneficiaries; and
> >
> > (ii)    Defraying reasonable expenses of administering the plan;
>
> (B)     With the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims;
>
> (C)     By diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so; and
>
> (D)     In accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of this title and Title IV.

80.     Under ERISA, fiduciaries that exercise discretionary authority or control over the selection of plan investments and the selection of plan service providers must act prudently and solely in the interest of participants in the plan when selecting investments and retaining service providers.

81.     Pursuant to these duties, fiduciaries must ensure that the services provided to the plan are necessary and that the fees are reasonable:

> Under section 404(a)(1) of ERISA, the responsible Plan fiduciaries must act prudently and solely in the interest of the Plan participants and beneficiaries both in

deciding … which investment options to utilize or make available to Plan participants or beneficiaries. In this regard, the responsible Plan fiduciaries must assure that the compensation paid directly or indirectly by the Plan to [service providers] is reasonable … .

DoL Ad. Op. 97-15A; DoL Ad. Op. 97-16A.

82.     The Department of Labor counsels that fiduciaries are responsible for ensuring that

a plan pays reasonable fees and expenses and that fiduciaries need to carefully evaluate differences in

fees and services between prospective service providers:

While the law does not specify a permissible level of fees, it does require that fees charged to a plan be "reasonable." After careful evaluation during the initial selection, the plan's fees and expenses should be monitored to determine whether they continue to be reasonable.

In comparing estimates from prospective service providers, ask which services are covered for the estimated fees and which are not. Some providers offer a number of services for one fee, sometimes referred to as a "bundled" services arrangement. Others charge separately for individual services. Compare all services to be provided with the total cost for each provider. Consider whether the estimate includes services you did not specify or want. Remember, all services have costs.

Some service providers may receive additional fees from investment vehicles, such as mutual funds, that may be offered under an employer's plan. For example, mutual funds often charge fees to pay brokers and other salespersons for promoting the fund and providing other services. There also may be sales and other related charges for investments offered by a service provider. Employers should ask prospective providers for a detailed explanation of all fees associated with their investment options.

*Meeting Your Fiduciary Responsibilities* (May 2004) (available at

http://www.dol.gov/ebsa/publications/fiduciaryresponsibility.html) (last viewed March 14,

2013).

In a separate publication, the Department of Labor writes:

Plan fees and expenses are important considerations for all types of retirement plans. As a plan fiduciary, you have an obligation under ERISA to prudently select and monitor plan investments, investment options made available to the plan's participants and beneficiaries, and the persons providing services to your plan. Understanding and evaluating plan fees and expenses associated with plan investments, investment options, and services are an important part of a fiduciary's

responsibility. This responsibility is ongoing. After careful evaluation during the initial selection, you will want to monitor plan fees and expenses to determine whether they continue to be reasonable in light of the services provided.

*Understanding Retirement Plan Fees and Expenses* (May 2004) (available at

http://www.dol.gov/ebsa/publications/undrstndgrtrmnt.html.)

83.     A fiduciary's duties of loyalty, prudence, and defraying plan expenses require it to

disregard plan documents or directives that it knows or reasonably should know would lead to an

imprudent result, or would otherwise harm plan participants or beneficiaries. ERISA §404(a)(1)(D),

29 U.S.C. §1104(a)(1)(D). Thus, a fiduciary may not blindly follow plan documents or directives that

would lead to an imprudent result or that would harm plan participants or beneficiaries, nor allow

others, including those whom they direct or who are directed by plan documents to do so.

84.     ERISA prohibits certain transactions with Plans involving parties in interest and

fiduciaries because of their significant potential for and risk of abuse. Specifically, ERISA §406

provides as follows:

> (a) Transactions between plan and party in interest
>
> Except as provided in section 1108 of this title:
>
> > (1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—
> >
> > > (A) Sale or exchange, or leasing, of any property between the plan and a party in interest;
> > >
> > > (B) Lending of money or other extension of credit between the plan and a party in interest;
> > >
> > > (C) Furnishing of goods, services, or facilities between the plan and a party in interest;
> > >
> > > (D) Transfer to, or use by or for the benefit of a party in interest, of any assets of the plan; or

17

(E) Acquisition, on behalf of the plan, of any employer security or employer real property in violation of section 1107(a) of this title.

(2) No fiduciary who has authority or discretion to control or manage the assets of a plan shall permit the plan to hold any employer security or employer real property if he knows or should know that holding such security or real property violates section 1107(a) of this title.

(b) Transactions between plan and fiduciary.

A fiduciary with respect to a plan shall not—

(1) Deal with the assets of the plan in his own interest or for his own account,

(2) In his individual or in any other capacity act in any transaction involving the plan on behalf of a party (or represent a party) whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries, or

(3) Receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan.

85.      No statutory or regulatory exemptions apply to the prohibited transactions alleged in this Complaint.

86.      ERISA §408(b)(2) exempts contracts and "reasonable arrangements with a party in interest for … services necessary for the establishment or operation of the plan, if no more than reasonable compensation is paid therefor." 29 U.S.C. §1108(b)(2).

87.      ERISA §408(b)(2) exempts only transactions with parties in interest under ERISA §406(a); it does not exempt violations of ERISA §406(b). 29 C.F.R. §2550.408b-2(e).

88.      When a fiduciary, such as Defendants here, has an interest in the entity providing services to the plan, as Defendants have an interest in Fidelity Operations here, the service-provider arrangement is per se prohibited. 29 C.F.R. §2550.408b-2(e)(1).

89.     A contract or arrangement for services between a party in interest and a plan is also

not exempt under ERISA §408(b)(2) if the service provider, here Fidelity, fails to make adequate

disclosures to the fiduciary for the plan. 29 C.F.R. §2550.408b-2(c).

90.     Among other things, recordkeepers such as Fidelity, who provide recordkeeping

services without explicit compensation or pursuant to offsets or rebates from other compensation

received by an affiliate of the service provider, must explicitly provide to the plan's fiduciaries

> a reasonable and good faith estimate of the cost to the covered plan of such recordkeeping
> services, including an explanation of the methodology and assumptions used to prepare the
> estimate and a detailed explanation of the recordkeeping services that will be provided to the
> covered plan. The estimate shall take into account, as applicable, the rates that the covered
> service provider, an affiliate, or a subcontractor would charge to, or be paid by, third parties,
> or the prevailing market rates charged, for similar recordkeeping services for a similar plan
> with a similar number of covered participants and beneficiaries.

29 C.F.R. §2550.408b-2(c)(iv)(D)(2). Plaintiffs believe, and on that basis allege, that no such

disclosures were provided to the Plan's fiduciaries.

91.     Recordkeepers such as Fidelity must also provide to the plan's fiduciary for every

single plan investment option

> [a] description of the annual operating expenses (e.g., expense ratio) if the return is not fixed
> and any ongoing expenses in addition to annual operating expenses (e.g., wrap fees, mortality
> and expense fees), or, for an investment contract, product, or entity that is a designated
> investment alternative, the total annual operating expenses expressed as a percentage and
> calculated in accordance with 29 CFR §2550.404a–5(h)(5).

29 C.F.R. §2550.408b-2(c)(iv)(F)(1). Plaintiffs believe, and on that basis allege, that no such

disclosures were provided to the Plan's fiduciaries.

92.     A recordkeeper may provide the disclosures regarding the operating expenses for a

plan's investment options by providing to the plan fiduciary the current disclosure materials

published by the issuer of the investment, e.g., the prospectus published by a mutual fund, provided

that the issuer is not an affiliate of the service provider. 29 C.F.R. §2550.408b-2(c)(iv)(F)(2). The

Fidelity Funds are affiliated with Fidelity Operations. Thus, Fidelity may not provide the requisite

disclosures on Plan investments by providing a prospectus to the Plan's fiduciaries. Plaintiffs believe, and on that basis allege, that Fidelity failed to provide the required disclosures to the Plan's fiduciaries other than by prospectuses issued by Fidelity Funds, if at all.

## VI. CLASS ALLEGATIONS

93.     Plaintiffs bring this action on behalf of a class defined as:

> All participants in the FMR LLC Profit Sharing Plan from January 8, 2008 to the present. Excluded from the class are Defendants, Defendants' beneficiaries, and Defendants' immediate families.

94.     Class certification is appropriate under Fed. R. Civ. P. 23(a) and (b)(1), (b)(2), and/or (b)(3).

95.     The class satisfies the numerosity requirement because it is composed of thousands of persons, in numerous locations. The Plan has averaged over 50,000 participants annually during the Class Period. The number of class members is so large that joinder of all its members is impracticable.

96.     Common questions of law and fact include:

A.  Whether Defendants were fiduciaries responsible for making decisions about the Plan's service providers;

B.  Whether Defendants breached their fiduciary duties to the Plan by failing to obtain a favorable revenue-sharing recapture arrangement with Fidelity;

C.  Whether Fidelity's recordkeeping arrangements with the Plan were reasonable;

D.  Whether Fidelity received more than reasonable compensation, direct or indirect, for providing recordkeeping and administrative services to the Plan.

97.     Plaintiffs' claims are typical of the claims of the Class. Plaintiffs have no interests that are antagonistic to the claims of the Class. Plaintiffs understand that this matter cannot be

settled without the Court's approval. Plaintiffs are not aware of another suit pending against Defendants arising from the same circumstances.

98.     Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs are committed to the vigorous representation of the Class. Plaintiffs' counsel are experienced in class action and ERISA litigation.

99.     A class action is the superior method for the fair and efficient adjudication of this controversy. Joinder of all members of the Class is impracticable. The losses suffered by some of the individual members of the Class may be small, and it would therefore be impracticable for individual members to bear the expense and burden of individual litigation to enforce their rights. Moreover, Defendants, as fiduciaries of the Plan, were obligated to treat all Class members similarly as Plan participants pursuant to written plan documents and ERISA, which impose uniform standards of conduct on fiduciaries. Individual proceedings, therefore, would pose the risk of inconsistent adjudications. Plaintiffs are unaware of any difficulty in the management of this action as a class action.

100.     This Class may be certified under Rule 23(b).

A.     23(b)(1). As an ERISA breach of fiduciary duty action, this action is a classic 23(b)(1) class action. Prosecution of separate actions by individual members would create the risk of (A) inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for the defendants opposing the Class, or (B) adjudications with respect to individual members of the Class that would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudication or substantially impair or impede their ability to protect their interests.

B.     23(b)(2). This action is suitable as a class action under 23(b)(2) because the Defendants have acted or refused to act on grounds generally applicable to the Class as a

whole, thereby making appropriate final injunctive, declaratory or other appropriate

equitable relief with respect to the Class.

    C.  23(b)(3). This action is suitable to proceed as a class action under 23(b)(3)

because questions of law and fact common to the members of the Class predominate over

individual questions, and this class action is superior to other available methods for the fair

and efficient adjudication of this controversy. Given the nature of the allegations, no class

member has an interest in individually controlling the prosecution of this matter, and

Plaintiffs are aware of no difficulties likely to be encountered in the management of this

matter as a class action.

## VII. <u>CLAIMS FOR RELIEF</u>

### <u>COUNT I</u>

### Breaches of Duty
### (Violation of §404(a) of ERISA)

    101.  Plaintiffs repeat and reallege each of the allegations set forth in the foregoing

paragraphs as if fully set forth herein.

    102.  ERISA §404(a) imposes on Defendants the duties of undivided loyalty, prudence,

and avoiding unreasonable plan expenses. Defendants breached each of these duties.

    103.  Defendants breached the duty of loyalty by entering into and maintaining a service

arrangement with Fidelity that caused the Plan to give up $85 million or more in revenue-sharing

rebates within the Relevant Period to Fidelity. They maintained this arrangement to benefit Fidelity.

    104.  Defendants breached the duty of prudence by failing to enter into and maintain a

service arrangement with Fidelity commensurate with what a prudent fiduciary acting in an arm's

length transaction would have arranged. In so doing, Defendants caused the Plan to forego millions

of dollars of revenue-sharing recapture.

105.    Defendants breached the duty of avoiding unreasonable plan expenses by entering into and maintaining a service arrangement with Fidelity that caused the Plan to effectively pay excessive recordkeeping and administrative fees.

106.    As a direct and proximate result of these breaches, the Plan and class members lost millions of dollars.

107.    Pursuant to ERISA §502(a) (2) and 409(a), 29 U.S.C. §1132(a) (2) and 29 U.S.C. §1109(a), Defendants are liable to disgorge all fees received from the Plan, directly or indirectly, and profits thereon, and restore all losses suffered by the Plan caused by their breaches of duty.

## COUNT II

### Prohibited Transactions
### (Violation of §406 of ERISA, 29 U.S.C. §1106)

108.    Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

109.    FMR and its subsidiaries are parties in interest to the Plan.

110.    FMR and the Retirement Committee members are fiduciaries to the Plan.

111.    ERISA §406(a)(1)(C), 29 U.S.C. §1106(a)(1)(C), prohibits a fiduciary from causing the Plan to contract or arrange for services to the Plan with a party in interest.

112.    Defendants caused the Plan to have a contract or arrangement with Fidelity Operations for recordkeeping, administrative, and trustee services.

113.    The Plan paid Fidelity, directly and indirectly, far in excess of reasonable compensation for providing such services.

114.    ERISA §406(b)(1), 29 U.S.C. §1106(b)(1), prohibits Defendants from using Plan assets for their own interests.

23

115.     Defendants caused the Plan to have a contract or arrangement with Fidelity Operations for recordkeeping, administrative, and trustee services to benefit themselves.

116.     ERISA §406(b)(2), 29 U.S.C. §1106(b)(2), prohibits Defendants acting in the interests of another party in a transaction involving the Plan.

117.     Defendants acted for the benefit of Fidelity when they caused the Plan to have a contract or arrangement with Fidelity for recordkeeping, administrative, and trustee services.

118.     ERISA does not provide any exemption from violations of 406(b) with respect to contracts or arrangements for services to the Plan.

119.     As a direct and proximate result of these prohibited transaction violations, the Plan, paid, directly and indirectly, millions of dollars in unjustifiably high recordkeeping and administrative services and suffered millions of dollars in losses thereby.

120.     Pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2), Defendants are liable to restore all losses suffered by the Plan as a result of the prohibited transactions and disgorge all revenues received by FMR and its subsidiaries from the fees paid by the Plan to FMR and its subsidiaries and as well as appropriate equitable relief.

## VIII. **DEMAND FOR JURY TRIAL**

121.     Plaintiffs demand a jury trial on all claims so triable.

## IX. **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for relief as follows:

1.     A declaration that the Defendants breached their fiduciary duties of loyalty, prudence, and defraying plan expenses under ERISA;

2.     A declaration that the Defendants violated ERISA §406 and participated in prohibited transactions;

3.      An order compelling the disgorgement of all revenue-sharing payments that should have been rebated to the Plan and instead were received, directly or indirectly, by FMR subsidiaries and affiliates, including disgorgement of profits thereon;

4.      An order compelling the Defendants to restore all losses to the Plan arising from Defendants' violations of ERISA, namely the difference between what the revenue-sharing payments typically made by Fidelity fund advisors under the circumstances alleged here and Fidelity's direct expenses in providing recordkeeping services to the Plan, plus opportunity losses to compensate for the Plan's lack of access to the monies during the Relevant Period;

5.      An order granting equitable restitution and other appropriate equitable monetary relief against Defendants;

6.      Such other equitable or remedial relief as may be appropriate, including the permanent removal of Defendants from any positions of trust with respect to the Plan, the appointment of independent fiduciaries to administer the Plan, and rescission of the Plan's investments in Fidelity Funds;

7.      An order certifying this action as a class action, designating the Class to receive the amounts restored or disgorged to the Plan, and imposing a constructive trust for distribution of those amounts to the extent required by law;

8.      An order enjoining Defendants collectively from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

9.      An order awarding Plaintiffs and the Class their attorneys' fees and costs pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g) and/or the Common Fund doctrine; and

10.     An order awarding such other and further relief as the Court deems equitable and just.

Dated: January 7, 2014                                    Respectfully submitted,


                                                          /S/ John Roddy
                                                          John Roddy, BBO No. 424240
Garrett W. Wotkyns                                        Elizabeth Ryan, BBO No. 549632
Michael C. McKay                                          BAILEY & GLASSER LLP
SCHNEIDER WALLACE                                         125 Summer Street
COTTRELL KONECKY LLP                                      Suite 1030
8501 North Scottsdale Rd., Suite 270                      Boston, MA 02110
Scottsdale, AZ 85253                                      Tel: (617) 439-6730
Tel: (480) 428-0142                                       Fax: (617) 951-3954
Fax: (866) 505-8036

                                                          Gregory Y. Porter
Peter Mougey                                              Gabriel Siegle
Laura Dunning                                             BAILEY & GLASSER LLP
LEVIN, PAPANTONIO, THOMAS,                                910 17th Street, NW
MITCHELL, RAFFERTY & PROCTOR                              Suite 800
316 S. Baylen Street, Suite 600                           Washington, DC 20006
Pensacola, FL 32502                                       Tel: (202) 463-2101
Tel: (850) 435-7121                                       Fax: (202) 463-2103
Fax: (850) 436-6147

                                                          Joseph C. Peiffer
                                                          Daniel Carr
                                                          PEIFFER ROSCA ABDULLAH
                                                          & CARR, LLC
                                                          201 St. Charles Avenue, Suite 4610
                                                          New Orleans, LA 70170-4600
                                                          Tel: (504) 523-2434
                                                          Fax: (504) 523-2464

                                                          *Attorneys for Plaintiffs*